OPINION *Page 2 
{¶ 1} Appellants John Kramer and Lisa Kimble appeal from the July 27, 2007 Judgment Entry of the Tuscarawas County Court of Common Pleas, Juvenile Division.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Appellant John Kramer and appellant Lisa Kimble are the biological parents of Omeikca Kramer (DOB 10/16/96), Johnna Kramer (DOB 9/22/97) and John Kramer III (DOB 7/4/01). The two have never been married. Appellant Lisa Kimble has three other children by a different father who are not the subject of this appeal.
 {¶ 3} On March 21, 2005, a shelter care hearing was held in the Tuscarawas County Court of Common Pleas, Juvenile Division, and the trial court ordered that the children be placed in the temporary custody of Tuscarawas County Job and Family Services. On March 22, 2005, Tuscarawas County Job and Family Services filed a complaint alleging that the three children were neglected and/or dependent children. At a hearing held on April 5, 2005, appellant John Kimble entered a plea of denial. Appellant Lisa Kimble entered a plea of denial at a hearing on April 11, 2005. An adjudicatory hearing was set for April 20, 2005.
 {¶ 4} Pursuant to a Judgment Entry filed on April 21, 2005, appellants entered admissions to an amended complaint alleging dependency. The allegations of neglect were dismissed upon the motion of Tuscarawas County Job and Family Services. The trial court, in its entry, set a dispositional hearing for May 17, 2005.
 {¶ 5} Following the dispositional hearing, the trial court, as memorialized in a Judgment Entry filed on May 18, 2005 and as agreed to by the parties and the Guardian *Page 3 
Tuscarawas County App. Case Nos. 2007 AP 08 0052 2007 AP 08 0053 3 Ad Litem, ordered the children to remain in the temporary custody of Tuscarawas County Job and Family Services.
 {¶ 6} Subsequently, on February 21, 2006, Tuscarawas County Job and Family Services filed a motion requesting, in part, a six month extension of the agency's temporary custody. Tuscarawas County Job and Family Services, in its motion, alleged that Lisa Kimble had completely failed to undertake appropriate case plan services, but that appellant John Kramer II had "made substantial progress in alleviating the concerns which led to the placement of the children outside his home." Tuscarawas County Job and Family Services further indicated that it anticipated reunification of the children into his home within the six month extension. A hearing on such motion was scheduled for March 13, 2006. Pursuant to a Judgment Entry filed on March 21, 2006, the motion was granted.
 {¶ 7} On October 16, 2006, Tuscarawas County Job and Family Services filed a Motion to Modify Prior Disposition and to Extend, asking that the children be temporarily placed with Dorothy Kramer, their grandmother, and that the agency's protective supervision over the children be extended for six months. Tuscarawas County Job and Family Services, in its motion, indicated that the three children had been returned to the custody of their father a number of months ago, but that there "was a significant likelihood that some physical altercation between John Jody Kramer [appellant John Kramer's wife] may have taken place." A hearing was scheduled for December 5, 2006.
 {¶ 8} On December 4, 2006, Tuscarawas County Job and Family Services filed a motion seeking permanent custody of the children. Tuscarawas County Job and Family Services, in its motion, alleged, in relevant part, as follows: *Page 4 
 {¶ 9} "The Kramer children had been in the temporary custody of their father. As detailed in a prior filing, problems including reported domestic incident and alcohol abuse by John Kramer led to his leaving the home. Jody Kramer his estranged wife has cared for the children. However, she is not in a position to provide long term care for them. A home study was done on the residence of Dorothy Kramer, the mother of John Kramer, which initially looked positive, however, problems have developed in that placement which make the same inappropriate.
 {¶ 10} "Lisa Kimble has not significantly changed the circumstances in her life that led to the agency's intervention in the first place. John Kramer has failed to complete services, and upon information and belief continues to abuse alcohol. Jody Kramer cannot continue to maintain the children. Some kinship providers have come forward, but none of them will take all of the children, and further evaluation is necessary of those respective placements to determine if any of them will be in the children's best interest."
 {¶ 11} At the December 5, 2006, hearing, Tuscarawas County Job and Family Services withdrew its October 16, 2006, Motion to Modify Prior Disposition and to Extend. The trial court, pursuant to a Judgment Entry filed on December 6, 2006, ordered that the children be placed in the agency's temporary custody and extended the agency's custody for an additional six months.
 {¶ 12} Thereafter, on March 2, 2007, Tuscarawas County Job and Family Services filed a Motion to Modify Prior Disposition, seeking permanent custody of the three children. The agency, in its motion, noted that the children had been in it temporary custody for a period of twelve out of the twenty-two months prior to the filing *Page 5 
of its motion and that "this case is at a statutory time line, and some permanent disposition regarding these children must be entered." A hearing on such motion was originally set for May 11, 2007, but was continued to July 26, 2007.
 {¶ 13} At the July 26, 2007, hearing, appellant Lisa Kimble testified that her three older children were in a planned permanent living arrangement and that she had not seen them very much. She testified that while she had been seeing all six of her children together for awhile, the children had to be separated because they were fighting. Appellant Lisa Kimble testified that she lived alone, but that Louis Tantarelli had stayed with her on and off until March, when he was charged with domestic violence as a result of an incident between the two.
 {¶ 14} Appellant Lisa Kimble testified that her case plan required her to undergo psychological testing and to maintain a job and housing for six months and that she believed she had done all that was required of her. When questioned, she testified that her weekly visits with her children, which were supervised, went well. She further testified that she asked her lawyer and case worker to file something to have her visits increased, although nothing was ever filed.
 {¶ 15} When questioned, appellant Lisa Kimble admitted that she knew that her children had alleged that her father, the children's grandfather, had molested them and that she continued allowing her children to have contact with their grandfather. She further admitted that she brought a picture of her father to visits with the children, although she testified that the picture was in her wallet and that the children wanted to look at the wallet. *Page 6 
 {¶ 16} At the hearing, appellant Lisa Kimble was questioned about her daughter Kimberly, who had passed away in 1996 when she was two years old. Eric Zeigler, appellant Lisa Kimble's then fiancé, was convicted of injuring Kimberly who died from complications two years after her injuries. Appellant Lisa Kimble admitted that she stood behind Zeigler throughout the investigation into the matter. Testimony was adduced at the hearing that she continued having contact with Zeigler while he was incarcerated and upon his release from prison.
 {¶ 17} At the hearing, the Guardian Ad Litem questioned appellant Lisa Kimble about Louis Tantarelli. Appellant Lisa Kimble testified that she talked to Tantarelli all of the time and that he stayed with her overnight sometimes. When questioned about why she called the police on April 1, 2007, appellant Lisa Kimble testified that Tantarelli had not hurt her, but had destroyed her property. The following is an excerpt from appellant Lisa Kimble's testimony:
 {¶ 18} "Q. Alright. He was, um, well, how, had he hurt you that night, Ma'am?
 {¶ 19} "A. No, he didn't hurt me. He just destroyed my stuff in the house.
 {¶ 20} "Q. Okay. The police report indicates that you had red marks on your arms, neck, and your facial area?
 {¶ 21} "A. That's because, they didn't put everything in the testament, in the paperwork, because he grabbed a hold of me because I had a hammer. He tackled me to the ground, that's how I got the red marks on me, in which it states there's a hammer incident in there where I grabbed a hammer.
 {¶ 22} "Q. What was the hammer for?
 {¶ 23} "A. Because I was telling him to get out of my house, to leave. *Page 7 
 {¶ 24} "Q. Were you using the hammer as a weapon?
 {¶ 25} "A. No, I was protecting myself.
 {¶ 26} "Q. Did you indicate to the police that you would have used it if he would . . .
 {¶ 27} "A. If he would have touched me, yeah.
 {¶ 28} "Q. Okay, but he did, in fact, tackle you?
 {¶ 29} "A. He had tackled me to get the hammer out of my hand.
 {¶ 30} "Q. Okay, and this is the same gentleman that still comes around your house and stays all night on occasion?
 {¶ 31} "A. Yeah.
 {¶ 32} "Q. Okay. Do you see that that could be harmful to your Children[1], Ma'am?
 {¶ 33} "A. Yeah, and he already knows that. I love my Children to death. I'll do anything for my Children. If it comes down to my Children, me and Louis don't need to be together, and he, I don't want that around my Children. I went through domestic violence before and I don't need that in my kids' life ever again.
 {¶ 34} "Q. Do you feel that it would have been important for, um, Job and Family Services and this Court to, to demonstrate, um, that you've healed and you're not going to allow these . . .
 {¶ 35} "A. Yeah . . .
 {¶ 36} "Q. Kind of relationships?
 {¶ 37} "A. Yeah." Transcript at 26-27.
 {¶ 38} At the hearing, appellant Lisa Kimble testified that she had completed domestic violence counseling two or three years before. When asked why, despite such *Page 8 
counseling, she maintained contact with Louis Tantarelli, she testified that she had known him for three years and did not believe that he would destroy her belongings. She admitted that her continued contact with him suggested that she lacked insight about people who were violent towards her.
 {¶ 39} At the hearing, appellant John Kramer testified that he was living with his sister and was currently laid off and was waiting to see if he would be taken back at his former place of employment. He further testified that he had completed his entire case plan except for Melymbrosia and that he had not been there for awhile "because me and my wife split up and you guys took the kids back from me and I, I just pretty much gave up." Transcript at 54. When asked, appellant John Kramer admitted that, while in the Melymbrosia program, he was involved in domestic violence problems with his wife and had problems with alcohol. As a result of an alcohol assessment, he had been ordered to stay in Melymbrosia, but dropped out before finishing the program. Appellant John Kramer admitted that he had a DUI at the end of 2006 and that alcohol was involved in the domestic violence incident with his wife. He denied having an alcohol problem.
 {¶ 40} At the hearing, appellant John Kramer testified that he was in Melymbrosia for anger issues and that his use of alcohol made such problems worse. He denied telling the people at Melymbrosia that he did not think that he needed to stop drinking. When asked by the trial court why he continued drinking, appellant John Kramer testified that "I just, I get upset anymore, you know, and I just, that's the first thing I pick up." Transcript at 59. *Page 9 
 {¶ 41} Appellant John Kramer testified that he had only missed two of his visits with his children. He further admitted that twice during this case the children had been placed with him and then removed again as a result of incidences involving alcohol use and his temper. The following is an excerpt from appellant John Kramer's testimony at the hearing:
 {¶ 42} "Q. Mr. Kramer, you understand that, and Job and Family Services has made it clear that the Children would not be returned to you if you continue to drink, is that correct?
 {¶ 43} "A. They didn't want me drinking, I know that.
 {¶ 44} "Q. Okay, and, in fact, when you have been drinking and gotten violent, the Children have been removed?
 {¶ 45} "A. Yes.
 {¶ 46} "Q. Okay, so the bottom line is you can't drink, would you agree with that?
 {¶ 47} "A. I agree with that.
 {¶ 48} "Q. Okay, and would you agree you can't drink because you get violent?
 {¶ 49} "A. Yeah.
 {¶ 50} "Q. Do you think that's something that these Children should be subjected to, Sir?
 {¶ 51} "A. No.
 {¶ 52} "Q. Do you want your Children returned, Sir?
 {¶ 53} "A. Yes I do.
 {¶ 54} "Q. But yet you continue to drink when you get upset? *Page 10 
 {¶ 55} "A. Yeah, but I never really drank around my kids, if that's what you're trying to say. I never drank around them.
 {¶ 56} "Q. Okay.
 {¶ 57} "A. I might have come back from drinking, but I never sat there and drank around them.
 {¶ 58} "Q. Okay. Would you agree that the, you drink the alcohol because it alters how you feel and how you handle things?
 {¶ 59} "A. No, I wouldn't say that. I just, sometimes I like to drink, you know.
 {¶ 60} "Q. Okay, in spite of the fact, Sir, how many DUI's do you have?
 {¶ 61} "A. One.
 {¶ 62} "Q. Alright, how many, uh, incidents of domestic violence do you have related to alcohol?
 {¶ 63} "A. A couple.
 {¶ 64} "Q. Okay, and would you agree, Sir, that it's caused you to lose your family?
 {¶ 65} "A. Yes." Transcript at 62-63.
 {¶ 66} Wendy Azzardi, a family service aide with Tuscarawas County Job and Family Services, testified that she had supervised visitation between appellant Lisa Kimble and the children since September of 2004 and that the visits were one hour a week. Azzardi testified that she was concerned about appellant Lisa Kimble's parenting skills and her inability to set limits, especially for John. According to Azzardi, appellant Lisa Kimble just gives in to John to avoid his tantrums. Azzardi further testified that from September of 2004 until recently, she, along with Case Manager Gabrielle *Page 11 
Weingarth, had spoken to appellant Lisa Kimble about problems during her visits. She further testified that for approximately a half an hour of the supervised visitation, all six children would visit with their mother together but that the older children got frustrated because their mother was not actively parenting the younger children. Azzardi testified that the older children told their mother what to do with the younger children and seemed to know more about caring for the children than their mother did.
 {¶ 67} During the hearing, Azzardi also testified that appellant Lisa Kimble showed up for a visit with pictures of her father. She further testified that appellant never came to her and asked for help to improve the visits. The following testimony was adduced when Azzardi was asked why she did not seek more visitation for appellant Lisa Kimble:
 {¶ 68} "A. No, I, I guess because if we were still struggling with behavior with John and managing him, um, also like not being sensitive to the kids as far as their emotions, um, even with the older kids kind of was concerning to me that, you know, she would bring pictures of grandpa even in April, that was kind of concerning to me that, that her girls would have to like relive what they went through." Transcript at 92.
 {¶ 69} When asked, Azzardi testified that she had concerns over appellant Lisa Kimble's ability to manage the children in her home full time. She testified that while, at times, John had not been excited to visit with his mother, all three of the children were excited to see her recently.
 {¶ 70} Azzardi was also questioned about the weekly visits between appellant John Kramer and his children. She testified that he had missed four visits since December of 2006, and that he was better at parenting than appellant Lisa Kimble *Page 12 
because he was able to set limits. She testified that the children were very happy to see him and upset when he did not come.
 {¶ 71} Gabrielle Weingarth, who was the case manager and is employed by Tuscarawas County Job and Family Services, testified that appellant Lisa Kimble's case plan required her to maintain housing and employment, undergo a psychological assessment and follow any recommendations, and to take parenting classes. She testified that appellant John Kramer's case plan required him to maintain housing, complete a drug and alcohol assessment, and to complete a psychological assessment and a domestic violence assessment.
 {¶ 72} Weingarth testified that appellant John Kramer had not had permanent housing since September of 2006 and that he lived with friends and family. She further testified that appellant John Kramer did not complete the drug and alcohol counseling that was recommended as a result of the psychological exam or complete another recommended substance abuse assessment. Weingarth further testified that the agency initially paid for the Melymbrosia program, but "after two failures of meeting the Program expectation and attendance, um, I was instructed by our supervisor that we would not pay the third time, . . ." Transcript at 117. She testified that she had concerns over placing the children with appellant John Kramer because of his alcohol use, his lack of stable housing, his sporadic employment and domestic violence issues.
 {¶ 73} At the hearing, Weingarth testified that appellant Lisa Kimble has maintained stable housing and that her house was clean. She testified that appellant Lisa Kimble's involvement with the agency went back to 1993 and that agency records showed the she was repeatedly involved with domestically violent men. According to *Page 13 
Weingarth, all of appellant Lisa Kimble's documented relationships were with men with a history of domestic violence. Weingarth testified that she did not believe that appellant Lisa Kimble benefited from domestic violence awareness counseling and that, if appellant Lisa Kimble told the court that she was not going to see Louis Tantarelli if she got the children back, she would not believe her. Weingarth voiced concerns about the children's safety if Tantarelli was around based on his drinking and that fact that the children said that he was mean to their mother.
 {¶ 74} Weingarth, when questioned about visitation, testified that appellant Lisa Kimble's visits with her children were chaotic and out of control, especially with all six children. She testified that once the children were divided, appellant Lisa Kimble did a little bit better with the children who are the subject of this appeal, but that John had a lot of tantrums and Kimble failed to address them. According to Weingarth, appellant Lisa Kimble has had the same problems with parenting in 1993.
 {¶ 75} Weingarth further testified that the children were removed from their mother's care due to poor supervision and because the children were left by themselves after Kimble was repeatedly told that this was not permissible. When asked if she believed that the agency expended reasonable efforts to allow reunification of the children into the home of either or both of their parents, Weingarth indicated that she did.
 {¶ 76} With respect to best interests, Weingarth testified that the three children did well together and relied on one another. According to Weingarth, the three children were doing extremely well in the same foster home and John, who had been diagnosed with ADHD, was able to go off of his medication. Weingarth further testified that John *Page 14 
had challenging behaviors and that his foster parents used strict discipline. She testified that he was a different child when he was with his foster parents and was very calm.
 {¶ 77} Weingarth also testified that the three children maintained contact with their older siblings, who were in a different foster home. The following is an excerpt from Weingarth's testimony:
 {¶ 78} "Q. Okay. At the present time, your knowledge may be limited by the fact that you transferred this Case, but the foster parents of these three younger Children have not yet made any commitment one way or the other about adoption if the Court grants permanent custody . . .
 {¶ 79} "A. No . . .
 {¶ 80} "Q. Is that correct?
 {¶ 81} "A. No, there hasn't been a commitment.
 {¶ 82} "Q. Okay, it's a, it's a potential but you don't know, correct?
 {¶ 83} "A. Correct.
 {¶ 84} "Q. Alright. Does that change your, your recommendation to the Court about permanent custody, whether that particular family is willing to commit to these Children?
 {¶ 85} "A. No it doesn't.
 {¶ 86} "Q. Okay. Do you think that a grant of permanent custody to the Agency would be in the best interest of these three Children?
 {¶ 87} "A. I do.
 {¶ 88} "Q. And are you aware of anything else you or any other service could have done here to alleviate the problems that still exist in both of these households? *Page 15 
 {¶ 89} "A. I really wish there was something else but I believe we expended every effort that we could for these Children and their parents.
 {¶ 90} Pursuant to a Judgment Entry filed on July 27, 2007, the trial court terminated appellants' parental rights and ordered that the three children be placed in the permanent custody of Tuscarawas County Job and Family Services. The trial court, in its Judgment Entry, found that the children had been in foster care for at least 12 out of the last 22 months and that the children cannot and should not be placed with either parent within a reasonable time.
 {¶ 91} Appellant John Kramer, in Case No. 07AP080052, now raises the following assignment of error on appeal:
 {¶ 92} "THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY TO JOBS AND FAMILY SERVICES AS JOBS AND FAMILY SERVICES FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT SUCH WAS IN THE BEST INTERESTS OF THE CHILDREN."
 {¶ 93} Appellant Lisa Kimble, in Case No. 07AP080053, raises the following assignments of error on appeal:
 {¶ 94} "I. THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO JOB AND FAMILY SERVICES AS THE AGENCY FAILED TO EXPEND REASONABLE EFFORTS TO REUNITE THE CHILDREN WITH APPELLANT/MOTHER, LISA KIMBLE.
 {¶ 95} "II. THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY TO JOB AND FAMILY SERVICES; AS JOB AND FAMILY SERVICES FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT A GRANT OF *Page 16 
PERMANENT CUSTODY WAS IN THE BEST INTERESTS OF THE CHILDREN AND THAT THE CHILDREN COULD NOT OR SHOULD NOT BE PLACED WITH THE MOTHER WITHIN A REASONABLE PERIOD OF TIME; AND THE DECISION WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."
 {¶ 96} The two cases have been consolidated by this Court pursuant to a Journal Entry filed on November 21, 2007. FIRST ASSIGNMENT OF ERROR CASE NO. 07AP080053 {¶ 97} In her first assignment of error, appellant Lisa Kimble argues that the trial court erred in granting permanent custody to Tuscarawas County Job and Family Services because the agency failed to expend reasonable efforts to reunite the children with her pursuant to R.C.2151.414(E)(1). We disagree.
 {¶ 98} "[Although R.C. 2151.414(E)(1) does refer to `reasonable case planning and diligent efforts by the agency[,]' it addresses those efforts within the context of the parent's failure to remedy the circumstances causing the child's removal from the home. `R.C.2151.414(E)(1) places no duty on the agency to prove that it exerted reasonable and diligent efforts toward reunification." See In reMiller, Licking App. No. 04 CA 32, 2005-Ohio-856 at paragraph 22, citingIn re Danella, Summit App. No. 20663, at 3, 2002-Ohio-141. (additional citations omitted).
 {¶ 99} The "reasonable effort to reunify" theme is instead found in R.C. 2151.419(A); this Court has previously concluded that reunification findings are not required where, as here, the agency files a motion to modify temporary custody to permanent custody. See Miller, paragraphs 28-29. See, also, In re Samples, Jefferson App. No. 05JE39,2006-Ohio-1056, at paragraph 75 *Page 17 
 {¶ 100} The trial court, in its July 27, 2007, Judgment Entry, found that Tuscarawas County Job and Family Services had used "diligent, reasonable efforts and planning" to remedy the problems that caused the children to be removed from the home and that both parents had "failed continually and repeatedly to substantially remedy the conditions causing removal." We agree.
 {¶ 101} Testimony was adduced at the hearing in this matter that appellant Lisa Kimble has a history of involvement with domestically violent men. At the hearing, she admitted that Louis Tantarelli still spent nights at her apartment despite the fact that he was charged with domestic violence. As noted by appellee, appellant Lisa Kimble has an established pattern of "endangering herself and her children by subjecting them to inappropriate and dangerous men . . ." While appellant Lisa Kimble has maintained stable housing, she has not maintained a safe home for her children. Testimony also was adduced that appellant Lisa Kimble has had the same parenting problems since 1993 and that she has trouble controlling her children, especially John, who has been diagnosed with ADHD. Moreover, testimony also was adduced that appellant Lisa Kimble had not benefitted from the counseling provided to her.
 {¶ 102} As noted by the trial court in its July 27, 2007, Judgment Entry, "after the completion of case plan services and all other agency assistance provided for at least 13 years, Lisa Kimble is in no better position to parent her children than she was at the time they were removed from her care."
 {¶ 103} Appellant Lisa Kimble's first assignment of error is, therefore, overruled. *Page 18 
 SOLE ASSIGNMENT OF ERROR CASE NO. 07AP080052 SECOND ASSIGNMENT OF ERROR CASE NO. 07AP080053 {¶ 104} Appellants, in the above assignments of error, contend that the trial court's finding that the best interest of the children would be served by granting permanent custody was against the manifest weight and sufficiency of the evidence. We disagree.
 {¶ 105} Revised Code § 2151.414(B)(1) addresses under what circumstances a trial court may grant permanent custody. This statute provides as follows:
 {¶ 106} "(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 {¶ 107} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 108} "(b) The child is abandoned.
 {¶ 109} "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 {¶ 110} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999." *Page 19 
 {¶ 111} In the case sub judice, the trial court found, pursuant to R.C. Section 2151.414(B)(1)(d), that the children had been in the temporary custody of the agency for a period of time in excess of twelve of the prior twenty-two consecutive months. The trial court further stated, pursuant to R.C. 2151.414(B)(1)(a), the children could not or should not be placed with either parent within a reasonable time.
 {¶ 112} As an initial matter, we note that appellant Lisa Kimble, in her second assignment of error, argues that the trial court erred in awarding permanent custody to Tuscarawas County Job and Family Services because the agency failed to prove that the children could not or should not be placed with her within a reasonable time. However, as findings under R.C. Section 2151.414(B)(1)(a) and R.C. Section 2151.414(B)(1)(d) are alternative findings, each is independently sufficient to use as a basis to grant the motion for permanent custody. In re LangfordChildren, Stark App. No. 2004CA00349, 2005-Ohio-2304, at paragraph 17. We conclude the trial court's finding that the children had been in temporary custody a period of time in excess of twelve of the prior twenty-two months with regard to this issue is not against the manifest weight or sufficiency of the evidence.
 {¶ 113} Moreover, we find that the trial court's finding that the children cannot and should not be placed with either parent within a reasonable period of time is not against the manifest weight of the evidence. Testimony was adduced at the hearing that appellant Lisa Kimble has a history of being involved with men who are domestically violent and that, as noted by the trial court, she "shows no signs of altering." As is stated above, appellant Lisa Kimble previously lost a daughter to an abusive relationship. Testimony also was adduced that she is unable to properly supervise or discipline her *Page 20 
children. As is stated above, her history with the agency dates back to 1993. With respect to appellant John Kramer, testimony was adduced at the hearing that the children had to be removed from his home due to domestic violence and alcohol issues. At the hearing, appellant John Kramer admitted that he continued using alcohol despite the effect that it has on his behavior. Testimony also was adduced that he was living with family members and was unemployed.
 {¶ 114} As is stated above, both appellants argue that the trial court's finding that it was in the children's best interest that permanent custody be granted to Tuscarawas County Job and Family Services was against the manifest weight of the evidence. We disagree.
 {¶ 115} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA-5758, 1982 WL 2911. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction (1978),54 Ohio St.2d 279, 376 N .E.2d 578.
 {¶ 116} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of *Page 21 
the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.
 {¶ 117} In the case sub judice, testimony was adduced at the hearing that the children have been in the same foster home since 2004 and are doing extremely well. Testimony also was adduced that John, who had been diagnosed with ADHD and had challenging behaviors, was able to go off of his medication and that he was a different child when he was with his foster parents and was very calm. Testimony also was adduced that the three children maintained contact with their older siblings, who were in a different foster home. The two sets of foster parents are related to each other.
 {¶ 118} At the hearing, Attorney Shawn Lindsay, who represents the children, stated on the record as follows:
 {¶ 119} "ATTORNEY SHAWN LINDSAY: Your Honor, I would, I would just, um, I wanted to let the Court know that I had the opportunity to meet with my Clients. They are very nice young Children, um, very knowledgeable. I explained what was going on here. Um, they did express to me that they, they are very comfortable where they're at but they do enjoy the visitation with their parents very much, um, they all spoke very highly of that. Omeikca, the oldest Child, she was very torn, um, between what was going on here. I did explain to them that there was no guarantee that they would remain in the foster home that they were at and they understood that. Um, but their position is that they're torn and they don't feel strongly enough either way, Your Honor, but I, I *Page 22 
would like the Court to know that they do feel very strong about the visitation with their parents and would like that to continue." Transcript at 3.
 {¶ 120} The Guardian ad Litem, Attorney Karen Dummermuth, in her July 26, 2007, report, stated that she believed that it was in the children's best interest for permanent custody to be granted to the agency because the children deserved stability and appellants could not provide the same to them. In her report, she noted that appellants were unable to address their own issues and continued having the same issues as when the children had entered care.
 {¶ 121} Based on the foregoing, we find that the trial court's finding that it was in the children's best interest that permanent custody be granted to Tuscarawas County Job and Family Services was not against the manifest weight of the evidence.
 {¶ 122} Accordingly, the judgment of the Tuscarawas County Court of Common Pleas, Juvenile Division, is affirmed.
 Edwards, J. Gwin, P.J. and Farmer, J. concur *Page 23 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Tuscarawas County Court of Common Pleas, Juvenile Division, is affirmed. Costs assessed to appellants.
[1] The word "Children" is capitalized throughout the transcript. *Page 1